## CITY OF RICHMOND, KY., v. FIDELITY & DEPOSIT CO. OF MARYLAND.
### No. 5727.

Circuit Court of Appeals, Sixth Circuit.
Nov. 3, 1931.

and early in 1925 this pavement had gone to pieces. The city made claim against the surety, which sent its engineer-adjuster. The cost of this repair was estimated at about $10,000, and of other repairs at about $5,000, and the surety paid, and the city accepted, this $15,000 in full release of the bond. Later, the surety brought this suit, alleging that its acceptance and payment of the $10,000 claim had been induced by the city's fraud, and seeking judgment for this amount. The case was heard as in equity, and the Surety Company recovered the desired judgment.

■ The issue mainly litigated and argued is whether the city so misled the surety, as to any essential fact and by representations upon which the surety has the right to rely, that a rescission is justified. There is no room for the theory of mutual mistake; unless the plaintiff establishes fraud, actual or constructive, it must fail; and the plaintiff in such an issue carries more than the ordinary burden of proof; it must establish the fraud by clear and convincing evidence.

Preliminary to examining the merits upon this issue, a question arises as to the right to a partial rescission. The contract of settlement covered all claims that had arisen under the bond, or which during the remainder of the five-year period might arise, against the surety. The claims which were at that time being urged against the surety related to (a) the entire work on East Main Street hill,—base, top, curbs, and gutters; and (b) curbs, gutters, and some top defects, scattered over other streets and other parts of this street. The amount of the total settlement was arrived at by estimates upon each item involved in (a) and (b). The alleged fraud, said to justify rescission, applies only to (a)—indeed, perhaps, only to part of the items involved in (a). Whether the adjustments agreed upon as to (a) and (b) were so separate that (a) could be rescinded and (b) left in force, or whether, on the other hand, the whole matter was a give and take settlement, no part of which was wholly independent, so that to rescind part and retain part makes for the parties a new bargain and enforces against the city compromises and concessions involved in (b) which it would not have made except for concessions received in (a), is not upon this record made as clear as it might have been. The burden was doubtless upon the surety to show that (a) was so separable as to justify rescission by itself; for the purposes of this opinion, we assume that the surety made a sufficient showing to this effect to require the city to go forward

J. J. Greenleaf, of Richmond, Ky. (Owen W. Hisle and Burnam & Greenleaf, all of Richmond, Ky., on the brief), for appellant.

R. L. Blackwell, of Louisville, Ky. (Wm. Marshall Bullitt, Leo T. Wolford, and Bruce & Bullitt, all of Louisville, Ky., and Joe P. Chenault, of Richmond, Ky., on the brief), for appellee.

Before DENISON, MOORMAN, and HICKENLOOPER, Circuit Judges.

DENISON, Circuit Judge.

The city of Richmond, in April, 1920, entered into a contract with Lampton & Burks, general contractors, to construct a concrete base, asphalt surface paving, with curbs and gutters, over several city streets. Lampton & Burks guaranteed the good quality of the work and the necessary maintenance for a period of five years. To secure the performance, they gave a $200,000 bond, with the Fidelity Company as surety. Within a year, serious trouble developed on what is known as the East Main Street hill. This was repaired by the city, but troubles continued,

with proofs to the contrary; and this it did not do in any satisfactory way.

■ Coming to the alleged fraud: The basis of the surety's contention is that it was liable only for the contractor's poor material or workmanship; that the pavement in question failed in neither of these respects, but disintegrated only through the action of water which worked up through the base and destroyed the top, and for which water damage the surety was not liable; and that, at the time of settlement, though the city knew the damage had been caused by water and not by poor work, it concealed that knowledge from the surety, and misled the surety into believing that water damage was not the cause.

If water caused the damage, it came from one of two sources: (1) Leaking water mains or service pipes, or (2) ground water coming out between the strata of the limestone rock in the hill on the side of which the road diagonally ascended and upon which strata the pavement concrete base was laid. As to liability for (2), the contract is somewhat ambiguous, because in one place it guarantees only the good quality of materials and workmanship, and in another place it guarantees the maintenance of the work in good condition for five years against all causes, excepting water mains and sewers. Giving the surety the benefit of the doubt, and assuming that the intent was to limit the liability to the results of defective workmanship or material, it is not easy to see how this ground water, if there was any, could force its way up through a properly constructed six-inch concrete base to disintegrate the top; but here again we assume that, if the damage came from such ground water only, the surety was not liable.

There is no dispute that, preceding the time of the settlement, the pavement on this hill had gone to pieces, so that the only practicable way of putting it in good order was to strip off the top and the binder, down to the concrete base, and lay them over again. The first question must be: Was this condition dominantly due to water damage of either kind, (1) or (2)? We may well start with the view of the surety's engineer-adjuster, a man of wide experience and capacity, whom, after preliminary negotiations, it sent from its home office to represent it. He described the bad condition of the pavement, said that he saw nothing indicating to him that it had been caused by water from below, and that he considered his company very plainly liable. "It was in awful con-

dition, and if we were not liable for that, I do not know what [we] were liable for." To claim that the damage had been caused by water, exonerating the surety, and yet that this expert, representing the surety and examining all apparent conditions—and they had not been in any respect remedied—did not even think of claiming that the damage was from this excusing cause, is to put a very heavy initial burden on the surety.

The evidence of poor workmanship and materials might well have been convincing to him. Several sections of the pavement had recently been cut out and sent away for analysis. This analysis, exhibited to him, indicated that neither the concrete base, bituminous binder, nor asphalt top complied with the specifications; it disclosed inferior materials and/or poor mixing. When the street was later stripped, it was further disclosed that the concrete base was of uneven thickness, being in places only two inches thick instead of six—indeed, in two places there was no concrete, the top being laid directly on the bed rock—that it had not been properly cleaned before applying the binder, and that the top was of uneven thickness varying from five inches to two, and of uneven consistency. This proof of defects existing at the time of settlement was not directly disputed. We find contra only the fact that the work had passed the city inspector at the time, and the general testimony of the contractor that the work was properly done. There is then the testimony of one of the contractor's workmen that he was instructed to use poorer material than that specified.

Passing then from the facts and appearances at the time of settlement to the history of the trouble: Within a few months after the work was done, water came up through the pavement at the bottom of the hill and continued to run in a stream. A water main ran up the hill under the pavement, and, when the grade had been cut down, at the time of the paving, a trench was cut in the underlying rock, the main relaid therein, and the trench filled with loose rock and the concrete base laid over it. Suspecting a leaky main, overlying sections of the pavement were removed progressively up the hill until a leak was found at the Elder service, a little below the top of the hill. This was repaired, and the original contractors restored the pavement where it had been injured by the water and by these section cuttings. It was fully understood between the city and the contractors that this responsibility rested on the city, and it paid the contractors for this

work. This was in August, 1921. As early as March, 1922, this pavement began to go bad again; holes gradually developed in it, and these continued to increase until the pavement reached the "awful" condition found in 1925. We find no satisfactory evidence that this later trouble was caused by water coming up through the base. A transverse drainage trench had been cut in the rock toward the bottom of the hill, communicating with the water main trench; and how any water could have come down the hill in the water main trench or among the rock strata, passed over this cross trench and then still further down the hill have been forced up through the concrete base, is unexplained. The theory as to the rock strata water is that it was forced up through some expansion crack in the base higher up the hill, then ran down between base and top, and at the bottom of the hill broke through the top. This is not impossible; but it is more probable that, if strata water did get on top of the concrete base, it came through the places where little or no concrete was laid on the ledge rock; and this would spell liability for poor work. Undoubtedly after a rain there was water standing in these holes and running out of them, and there was naturally a common impression that the trouble was the same as it had been before. Citizens would naturally assume that there was another water main or service leak coming down the trench, as the other had; but, when the street was later stripped, it was demonstrated that there was no such leak; everything was dry for weeks before the top was relaid. It resulted that during two years, say in 1922 and 1923, as the pavement was increasingly coming to be in bad condition, the city officers undoubtedly were taking it for granted that the cause of the trouble was water, and that the contractors were not liable. The mayor's correspondence with the contractors indicates his acceptance of their position that they were not liable for what had then developed, and of their suggestion that nothing should be done until about the end of the five-year period, when all defects which had then developed could be adjusted. The resident engineer later employed by the city in this matter testified that for a year or two he assumed that water was still causing the trouble; but that later, as he observed that the holes in the pavement were dry during dry weather, and that similar breaks were developing up and beyond the top of the hill where there could be no water, he changed his mind. The mayor's testimony indicates the same change of view; but, following the contractors' sugges-

tion of waiting, no demands were made upon them. In August, 1923, the mayor wrote to the contractors complaining of developing defects which he evidently considered it the contractors' duty to repair, but not specifically mentioning the East Main Street hill. The contractors replied that they would go to Richmond as soon as possible and see about it. They did not go. On February 14, 1924, he wrote them again, specially asking attention to defects on East Main Street hill, but the language employed not making it clear whether he did or did not make claim of liability therefor. To this letter no reply was received. In February, 1925, he made a demand against the surety, which did refer to this particular work, among other. This early acceptance by the city of the contractors' theory that the continuing damage was from continuing water seepage was very natural, but it does not seem at all controlling as to the real fact. It is undisputed that, while the disintegration of the pavement could have been caused by water at the bottom and lower part of the hill, the same trouble continued to develop up to the top of the hill and beyond on the level ground, thus demonstrating that water could not have been exclusive cause.

It is urged that the trouble developed chiefly in the north half of the roadway, while as to the south half the pavement was relatively good, thus indicating that bad material and workmanship could not have been the cause. The answer is that the north half was the downward traffic side, the hill was steep, and was used by loaded trucks coming down from the station; it clearly appears that such traffic would use up a pavement much more quickly than up-hill traffic with lighter loads. There is testimony that water was seen "bubbling up" out of some of these holes in the pavement, thus indicating pressure from higher up the hill rather than the running over of pavement surface water; but it is difficult to surmise physical facts consistent with proper pavement construction which would produce this result. The testimony regarding it is brief and casual, and we must attribute it to natural exaggeration rather than to accurate observation and memory. Considering the proved absence of any water main leak at that time, it is too improbable to be the basis of a serious conclusion.

Upon the whole record, it does not appear by a preponderance of proofs that the bad condition of the pavement on this hill in 1925 was substantially due to water leaks or water

seepage; but, assuming the contrary for the moment, was there then in that respect any fraudulent misleading of the surety? It is not claimed that any affirmative misrepresentation was made to the surety. Its engineer asked no questions on that subject—evidently because the liability seemed to him so clear. Looking at the rocky cut on the side of and above the road, as it went somewhat diagonally up the hill, he asked the city engineer if they had ever had any trouble from water in that bank, evidently thinking that perhaps there should be a drain below and parallel to the curb on this side. The city engineer replied that he had never seen any water there. There is nothing to dispute that statement, or to show that any one ever saw any water there. Clearly there was no actionable misleading by this statement.

The mayor's first letter to the surety said that he had repeatedly complained to the contractors and they would pay no attention. To his complaint in 1922 they had paid attention and had convinced him that the damage was from water, outside of their liability. To his further complaint in 1923 they had promptly answered, but had done nothing. His letter to them of February, 1924, remained, after eleven months, entirely unanswered. We cannot see that his overstatement in this particular, in his letter to the surety, indicates substantial misleading. No one representing the surety asked to see the correspondence with the contractors until after the settlement; as soon as requested, it was shown. The mayor's letter also said that he understood the contractors had been adjudicated bankrupts, and so it was useless to follow them. The surety's representative made no substantial efforts to find whether this was true, or to reach the contractors and get their side of the story. In fact, the contractors, as partners, had not been so adjudicated, but a corporation of a similar name, in which form they had latterly carried on their contracting business, had been declared a bankrupt, and the partners were irresponsible. This inaccuracy in the mayor's letter was immaterial.

The whole strength of the surety's case on this line rests on the conclusion that, because in 1922 the city and the contractors had joined in accepting the theory that the damage was from water, and that the contractors were not liable,[1] and the city had never notified them that it repudiated this theory, there-

fore it was the duty of the city to disclose to the surety this fact. The opinion of the trial judge rests upon the idea that there was such a fiduciary relationship between the obligee and the surety that the former, when making claim under the bond, should disclose all the material facts. We cannot find any sufficient basis for that theory, either in principle or in precedent. At the time a surety bond contract is entered into, the principal on the bond ought to make a full disclosure of the risk; and, if the obligee knows and does not disclose that the principal is concealing some material fact, that knowledge might justify the surety in a later denial of liability; while liability is accruing, and the surety might protect itself from an increase, the obligee should be scrupulous not to promote a false sense of security; but, after the contract has been made and the contemplated transactions have ended, and the obligee in good faith makes a claim against the surety, we know of no reason why he should disclose facts which might tend to dispute his claim, and which are not within his exclusive knowledge, but which are entirely accessible to the surety by the most ordinary inquiry. The authorities relied upon,[2] in so far as they reach at all a final claim of liability, go no further than to hold that the obligee's demand must be held and presented in good faith. We find nothing to impeach the city's good faith here; indeed, as we have said, we think the invalidity of its claim is not established by a preponderance of the evidence.

For the reasons stated, the decree must be reversed and the record remanded, with instructions to dismiss the bill.

---

[1] There is reference to this understanding as an "agreement." It was not. There was no consideration to support a contract. It was merely acquiescence by the city in the contractors' explanation of the trouble.

[2] Brandt on Suretyship (3d Ed.) § 447; Pomeroy's Eq. Jurisp. vol. 2 (4th Ed.) § 907; Story's Eq. Jurisp. vol. 1 (14th Ed.) § 448; case cited in these texts; Frank Fehr Brewing Co. v. Mullican, 66 S. W. 627, 23 Ky. Law Rep. 2100.